## EHRLICH v. HIGGINS, Collector of Internal Revenue.

District Court, S. D. New York.

Sept. 27, 1943.

806

Maass & Davidson, Herbert H. Maass, and Monroe L. Friedman, all of New York City, for plaintiff.

Mathias F. Correa, U. S. Atty., and Wm. L. Lynch, Asst. U. S. Atty., both of New York City, for defendant.

JAMES ALGER FEE, District Judge.

Plaintiff is the widow of Paul Ehrlich, an eminent German physician and scientist, the discoverer of "Salvarsan", who died in Europe in 1915. She is an alien, who at the date of the transaction resided in Switzerland, but who now resides in the United States. She and her husband had two daughters, who are now naturalized American citizens. One of these daughters also had a son who participated in the transaction. Warner Bros. Pictures, Inc.,[1] an important motion picture producer, became interested in the portrayal of the life of Ehrlich, and preliminary drafts were written of the motion picture subsequently produced as "Dr. Ehrlich's Magic Bullet". This manuscript was based upon data already in Warner's possession and in the public domain. Warner, through the medium of the grandson of plaintiff, entered into a contract dated September 27, 1939. Thereby the Ehrlich family granted, as to certain material consisting of letters, photographs, books, original notes and other documents, the exclusive world-wide rights for use thereof to Warner in or in connection with motion pictures, radio and television broadcasts as well as advertising pertaining thereto. It was definitely provided such use must deal with the life and work of Paul Ehrlich. The material was to be furnished to Warner immediately and returned not later than May 15, 1940, to the Ehrlich family, who retained all other rights in connection therewith. It was agreed also that each member of the Ehrlich family would execute a document in a form attached to the contract. This form of document recited that Warner contemplated the production of a motion picture about the life and work of Paul Ehrlich, and specified that the signer granted to Warner the exclusive right to use the name, likeness or representation of the signer for the purposes of trade or advertising throughout the world and, particularly, in the motion pictures. The instrument also provided that the person executing it would not institute any action against Warner connect-

---

[1] Hereinafter called "Warner".

ed with "the exercise of any of the rights granted to Warner, and/or on the ground that Warner has published anything libelous, slanderous or defamatory of or concerning the undersigned, or has used her name, photograph, portrait, picture, physical likeness, representation or impersonation in any improper or unauthorized manner".

The consideration for the contract was a lump sum of $42,500, to be paid in three installments.

Warner, purporting to comply with Section 143(b) of the Revenue Act of 1938,[2] withheld from this sum $4,250, which was ten per cent of the total consideration. On June 14, 1940, this amount was paid by Warner to defendant, as Collector of Internal Revenue. On August 26, 1940, plaintiff filed a claim for refund. Thereafter, when more than six months had elapsed since the filing without approval or rejection thereof by the Commissioner of Internal Revenue, plaintiff instituted action for the sum withheld. The Commissioner thereupon definitely rejected the claim.

The burden is upon the plaintiff to establish the incorrectness of the determination of the Commissioner. Plaintiff has main bases of attack which are interconnected. It is contended that Warner made an outright purchase of the "material" and that this transaction was not therefore taxable.[3] The defendant takes the position that the "material" was not sold outright but only that the rights to use the same in connection with motion pictures and television were granted. Inasmuch as the "material" was to be returned to the Ehrlich family at a definite date and there was reserved to them the right to use the "material" in book form or in any other not specifically permitted to Warner, it is clear the certain limited "use" rights were allowed to Warner and that no purchase or sale was effected. Even though the time was unlimited, the periodic payments were actually royalties[4] paid in advance for the use of the "material" in the limited manner specified in the contract. Under the doctrine of Sabatini v. Commissioner of Internal Revenue, 2 Cir., 98 F.2d 753, the payments would be, then, taxable income.

Plaintiff apparently shifts ground in the next contention. It is claimed that the "material" was of no value and that what Warner actually paid was damages for the violation of the right of privacy, which inheres in plaintiff and her daughters. It is argued that since the right of privacy is not property but a personal privilege, the payment of damages for its viola-

---

[2] 26 U.S.C.A. Int.Rev.Code, § 143(b): "Withholding of tax at source * * *.

"(b) Nonresident aliens. All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of interest (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having an office or place of business therein), dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income (but only to the extent that any of the above items constitutes gross income from sources within the United States), or any nonresident alien individual, or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, shall (except in the cases provided for in subsection (a) of this section and except as otherwise provided in regulations prescribed by the Commissioner under section 215) deduct and withhold from such annual or periodical gains, profits, and income a tax equal to 10 per centum thereof, except that such rate shall be reduced, in the case of a nonresident alien individual a resident of a contiguous country, to such rate (not less than 5 per centum) as may be provided by treaty with such country: * * *".

[3] A similar contention that a transaction which bears a likeness to this was the sale of a "capital asset" was rejected by The Tax Court in Clifford H. and Kathryn Goldsmith v. Commissioner of Internal Revenue, 1 T.C. 711, Promulgated March 5, 1943.

[4] 26 U.S.C.A. Int.Rev.Code, § 119. "Income from sources within United States.

"(a) Gross income from sources in United States. The following items of gross income shall be treated as income from sources within the United States: * * *

"(4) Rentals and Royalties. Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property; and * * *."

tion is not "income", as defined by the statute.

These points will be dealt with in that order. As to the first, it may be said that although there was evidence offered to show that no change was made in the manuscript after the contract was executed and that the motion picture as exhibited in final form was substantially the same as appeared in the revised manuscript completed prior to the contract, this circumstance does not bear upon the question. Warner in the agreement bargained for the use of the material, among other things. It is speculative to say that Warner wished to purchase the rights so that it could not be claimed afterward that it stole or plagiarized part of the "material" or violated some copyright. The contract reads "use of the said material", as if this were the important item of the consideration and the covenant not to sue for defamation were negligible. The evidence does not show that Warner has published anything "libelous, slanderous or defamatory" of plaintiff or any of her daughters, nor that Warner has used the name, photograph, portrait, picture, physical likeness, representation or impersonation of plaintiff or any of her daughters in an "improper or unauthorized" manner. The covenant not to sue was under the evidence valueless. This disposes of the argument that this was damages paid in advance for the violation of the personal right of privacy, because it is not shown that such a right was violated.[5] The rule, that damages recovered because of personal injuries and illness are exempt, is irrelevant, therefore. Damages recovered for alienation of affections, breach of promise to marry, and libel and slander, together with alimony and separation payments, are ordinarily not taxable. But under the facts here, there is no analogy between the situations, because here no wrong has been done. It is true that in the cases mentioned above, no judgment need be rendered by a court to make the payments exempt, but no case says that the wrong must not have been committed.

It seems probable that if a woman were paid a consideration in monthly payments for a voluntary release of her fiance from a promise to marry, she would be paid for giving up a legal right and, therefore, the foundation would be the same as in all other contracts.

The only suggestion in the literature on the subject that a contrary result might be reached appears in an opinion of the Solicitor of Internal Revenue (Cumulative Bulletin I–1, 92), where it is said that money received by a parent in consideration of the surrender of his right to the custody of his minor child stands on the same basis as damages for alienation of affections and damages for personal libel or slander. This notion permits no distinction between damages for wrongs committed and payments for giving up any legal right. The parent could contract for the labor of the child and the payments would not be exempt. By no logical process, then, can it be held that a contract to give up custody would be exempt. The writer of the opinion arrived at the conclusion by the emotional avenue, saying that: "Holding otherwise would be equivalent to treating as chattels the wife whose affections were alienated and the child whose custody was surrendered." The real difference between the two cases is that in one there is consummated damage to a personal right[6] which is compensated, and in the other a simple contract, whereby a right presently possessed is resigned for a future period for money.[7]

---

[5] "Borden did not and could not get his privilege; all it got was his promise not to exercise his privilege, and it paid him in advance for the performance of this promise." Beals' Estate v. Commissioner of Internal Revenue, 2 Cir., 82 F.2d 268, 270.

[6] The case of Central R. Co. of New Jersey v. Commissioner of Internal Revenue, 3 Cir., 79 F.2d 697, 698, 101 A.L.R. 1448, related to a situation where one of the officers of the company organized and controlled a company which carried on business operations adverse to the company's interest and thereby obtained profits. The company brought suit and obtained a settlement. Held this was not income but was an amount which the officer was penalized for improper operations and the company received a windfall. "The thought is that a recovery in such actions is compensatory. The damages are in payment of injuries sustained."

[7] The case of Beals' Estate v. Commissioner of Internal Revenue, supra, 82 F.2d at page 270, shows clearly that income results when no property right is transferred, where it is said: "A promise not to work for others or for oneself is no more a conveyance of property than is a promise to enter the promisee's employ. Payment for either promise is income, not proceeds re-

Much more accurate are the cases which recognize the fact that contractual surrender of any legal right for stated payments produces income to the recipient. So it has been held that payments not to work for another or compete in business [8] are taxable as income. So, also, the sales of good will, together with tangible assets of a business [9] are subject to the laws regulating taxes.

If the contrary principle were recognized, there would be suits for refunds by each of the actresses in Hollywood upon the ground that, although each is paid a salary for personal services in the production of films, the real value which the producer obtains from the contract is the right to produce before the public the representation so made, and that the payments are really damages in prospect for the violation of the right of personal privacy. The revenue laws do not contain any such loophole.

Even if it were determined that Warner compensated plaintiff for the personal privilege contained in the right of privacy and that such payments do not constitute income, with this particular contract no allocation is possible. As before pointed out, it is wildest speculation to determine how much value Warner placed on the right to use the "material". Similarly, it would be speculative to determine whether plaintiff placed more value on the money payments or the clauses in which Warner agreed to deliver a copy of the script in advance of its use to Schwerin and to give due consideration to his views thereon, to portray the likeness of the Ehrlich family as accurately as possible and in as favorable a light as possible, not to portray any events connected with the Ehrlich family purporting to occur after 1925, to use the name of Paul Ehrlich in the title or subtitle of the film or in an official announcement prior to the first scene. It is just as probable that they bargained for these clauses in return for the surrender of the personal privilege with which these are closely connected and that they received the money for the use of the "material" alone.

No apportionment or allocation can be made on this contract. It is like the sale of good will in connection with tangible assets.

Findings and judgment in favor of the Collector of Internal Revenue may be prepared.

---

ceived on disposal of a capital asset".

"If he sells his services for wages or salary, what he receives is income. If he refrains from exercising his skill and ability in a particular line for a definite period, what he receives in compensation in the common understanding is just as much a gain and is income". Cox v. Helvering, 63 App.D.C. 264, 71 F.2d 987, 988.

"The payments were made to him for foregoing his right to authorize others for a time to publish the works here." Saba-

tini v. Commissioner of Internal Revenue, supra, 98 F.2d at 755.

[8] See Beals' Estate v. Commissioner, supra. See, also, Salvage v. Commissioner of Internal Revenue, 2 Cir., 76 F.2d 112, affirmed on other grounds Helvering v. Salvage, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511. Cox v. Helvering, supra.

[9] Pfleghar Hardware Specialty Co. v. Blair, Commissioner of Internal Revenue, 2 Cir., 30 F.2d 614.